UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 08-10121-GAO

UNITED STATES OF AMERICA,

v.

J. DANIEL LINDLEY,
Defendant.

OPINION AND ORDER
November 22, 2010

O'TOOLE, D.J.

The defendant, J. Daniel Lindley, was tried on an indictment charging him with one count of conspiracy to commit wire fraud in violation of 18 U.S.C.A. § 371 (Count 1), forty-one counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 2-42), and nineteen counts of unlawful monetary transactions (money laundering) in violation of 18 U.S.C. § 1957 (Counts 43-61). The jury returned a verdict finding him guilty on Counts 1, 4-15, 18-19, 25-40, 44-49, 51, and 54-61.

Following the trial, Lindley filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), or in the alternative, for new trial pursuant to Federal Rule of Criminal Procedure 33. He argues that the evidence was insufficient to sustain the conviction, or alternatively, that a new trial is warranted based on the government's closing arguments and on the grounds that the verdicts were against the weight of the evidence.

It was the government's theory that Lindley either actually knew of, or was willfully blind to, the existence of the conspiracy and intentionally joined and advanced the work of the conspiracy. There was evidence that there were a variety of irregularities, many of which were

recurring, in the documents Lindley signed and the closings he supervised or conducted. For instance, based on evidence introduced by the government and reasonable inferences derived therefrom, a rational jury could have concluded that the defendant, at least at times, attended separate closings and/or signed separate HUD-1 statements; signed checks, including to the same recipients, without inquiring about the details of the payouts; signed statements from lenders that he had received funds from the borrowers at the closings when this was not always true; conducted closings in which the same buyers made multiple purchases within a short period of time and in which addresses and employers appeared repeatedly in documents for different closings; did not seem to review his own files; and routinely split seller proceeds.

Although willful blindness is a way of proving knowledge of the existence of the conspiracy, the government may not prove a defendant's intent to agree to the conspiracy through willful blindness. See Lizardo, 445 F.3d at 85-86. However, the necessary intent may be proven by inferences from other evidence. Id. at 86. Here, the cumulative weight of the evidence, viewed favorably to the verdict, supported a conclusion by a rational jury that the defendant intended to participate in and help bring about the goals of the conspiracy. See United States v. Portalla, 496 F.3d 23, 26-27 (1st Cir. 2007) ("The sum of an evidentiary presentation may well be greater than its constituent parts.") (quoting United States v. Downs-Moses, 329 F.3d 253, 261 (1st Cir. 2003)).

Based on essentially the same evidence, viewed in the light most favorable to the verdict, a rational jury could have concluded that the required mental states for the substantive wire fraud and money laundering counts had been established beyond a reasonable doubt.

The defendant next argues that he should be granted a new trial due to the government's statements during its closing and rebuttal. Specifically, he claims that the government improperly argued that the fact that he had taken over Eric Levine's real estate practice gave him an incentive to engage in the conspiracy and to ignore so-called "red flags" during the course of the conspiracy.

Remarks made by a prosecutor in a closing argument warrant a new trial only if they are both "inappropriate and harmful." United States v. Balsam, 203 F.3d 72, 87 (1st Cir. 2000) (quoting United States v. Laboy-Delgado, 84 F.3d 22, 29 (1st Cir. 1996)). "Prosecutorial comments will be found harmful if, 'in the totality of the circumstances, they would probably have affected the outcome of the trial.'" Id. (quoting Laboy-Delgado, 84 F.3d at 29)).

*1. "Quarter Million Dollars"*

The defendant first contends that it was improper for the government to argue that Lindley's motive for engaging in the enterprise was the value of the real estate closing practice because the government did not present any evidence as to its value. This is not the case. Specifically, Trial Exhibit No. 2607A, a summary chart purportedly based on the settlement statements admitted in evidence, indicates that the defendant received $43,018.75 in closing fees from the twenty-one closings charged in the indictment, for an average of about $2,000 per closing. On the evidence submitted at trial, it was clear that the defendant conducted significantly more closings through Levine's business than were charged in the indictment. A reasonable juror could infer, then, that Levine's business was financially valuable to the defendant.

More specifically, in its closing, the government argued that the value of the business was a quarter of a million dollars. There is support for that number in the record. A witness who had worked for Levine, Lindsay MacPhee, testified that when the defendant[1] took over the business, the office was doing approximately ten closings per week. When cross-examined by Levine's attorney, she further testified that, at least at its busiest times, the defendant conducted about forty closings a month—consistent with her testimony on direct that the office did approximately ten closings per week—and earned fees of about $20,000 a month from the closings. Although the attorney's next question, computing the annual salary as $240,000, went unanswered, any juror who knew how to multiply 12 times $20,000 (presumably every juror) could have made the same computation for the value of the real estate business Levine gave to the defendant. It was not necessary for there to be explicit testimony to that effect, and it was not improper for the government to make the assertion in its closing.[2]

Finally, to the extent that the defendant contends that the theory upon which the government relied in its closing was improper because it may have differed from earlier theories, that argument too must fail. First, there is no prohibition barring the government from proceeding on alternate theories in a criminal case. See United States v. Cassiere, 4 F.3d 1006, 1024 (1st Cir. 1993). Second, the government "need not recite all of its evidence in the indictment, nor is it limited at trial to the overt acts listed in the indictment." United States v.

---

[1] To be precise, the government's question literally asked about "Levine," not "Lindley," taking over the business. From the context, however, it is apparent that the government intended to ask about Lindley, that when MacPhee answered, she was referring to Lindley, and that the jury understood it that way.

[2] In its closing argument, the government misstated the number of closings the defendant was estimated to have completed per month. Rather than forty, the number estimated by MacPhee, the government stated it was twenty. The understatement in the number of closings did not prejudice the defendant, nor can it be said that it impacted the outcome of the trial, particularly when the government quoted the total amount as a quarter of a million dollars, a number based on the evidence in the record.

Innamorati, 996 F.2d 456, 477 (1st Cir. 1993). The indictment charged Lindley with conspiracy, wire fraud, and money laundering, and the argument about which Lindley complains was within the scope of the allegations and consistent with the evidence presented at trial. The defendant had sufficient notice, through the indictment, of the charges against him, and it was not impermissible for the government to argue the theory of willful blindness, which was based on evidence in the record, in its closing.

### 2.   *"Red Flags"*

Finally, the defendant contends that the government improperly referred to "red flags" in its closing and rebuttal. The defendant appears to find issue with the government's specific examples and the government's description of additional examples in its rebuttal.

As to the first argument, the examples of so-called "red flags" were not improper. The government pointed to red flags to show the defendant's knowledge, as well as to demonstrate how the scheme worked, i.e., Levine, a suspended attorney, found a practicing attorney whom he could direct and who would ignore warning signals. The examples cited by the government were based on evidence and their use for either purpose was not improper.

As to the second argument, the government did not raise a new argument in its rebuttal, but rather merely offered additional support for the argument that was previously addressed and contested by the defendant, who argued that he had no knowledge of the scheme and that there were no red flags. The government did not impermissibly exceed the scope, nor did the reference to additional red flags, such as the repeated use of employers in loan applications and the defendant's lack of review of his own files, unfairly surprise the defendant.

For the foregoing reasons, the Defendant's Motion for Judgment of Acquittal or in the Alternative for New Trial (dkt. no. 511) is DENIED.

It is SO ORDERED.

/s/ George A. O"Toole, Jr.
United States District Judge