UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
J. DANIEL LINDLEY,                  )
          Petitioner,               )
                                    )
v.                                  )        Criminal No. 08-10121-LTS
                                    )
UNITED STATES OF AMERICA,           )
          Respondent.               )
_____)

MEMORANDUM AND ORDER ON FIRST AMENDED MOTION UNDER
28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE (DOC. NO. 1024)

May 16, 2018

SOROKIN, J.

J. Daniel Lindley, an attorney convicted of crimes arising from his participation in a

mortgage fraud scheme, filed a motion to vacate, set aside, or correct his sentence pursuant to 28

U.S.C. § 2255.  Doc. No. 1024.  He raised a litany of challenges to the performance of his trial

counsel, attorney Robert Sheketoff.[1]  The government opposed the motion.  Doc. No. 1108.

Lindley replied with a "Request for Findings and Rulings."  Doc. No. 1163.  The Court held an

evidentiary hearing on certain aspects of Lindley's motion on December 13, 2017.[2]  Doc. No.

1236.  Having considered all of the parties' relevant submissions, the evidence presented at the

hearing, and the record of Lindley's 2010 trial, the Court DENIES Lindley's motion.

I.      BACKGROUND

        A.      Factual and Procedural History

        On June 2, 2010, after a six-week jury trial, Lindley was convicted of conspiracy, thirty

counts of wire fraud, and fifteen counts of money laundering in violation of federal law.  United

_____
[1] Lindley has withdrawn a claim that his appellate counsel was ineffective.  Doc. No. 1238 at 1.
[2] Lindley filed his motion pro se, but was represented by counsel at the hearing.  Doc. No. 1221.

States v. Appolon, 695 F.3d 44, 52 (1st Cir. 2012).  Four co-conspirators tried with Lindley also were convicted of various offenses.  Id. at 51-52.  Lindley was sentenced on November 10, 2010 to seventy-two months' incarceration, followed by a term of supervised release.  Doc. No. 662.  He has served his sentence.[3]  Doc. No. 1166.

The charges arose from a "mortgage fraud scheme" that Lindley and his co-conspirators "devised and executed . . . between May 2005 and June 2006."  Appolon, 695 F.3d at 51.  The First Circuit described the general scheme as follows:

> [Lindley and his] coconspirators arranged for straw buyers to purchase real property at the asking price, falsified mortgage loan applications for the straw buyers to obtain financing for an artificially-inflated purchase price, and pocketed the difference.  The loans secured by each of the properties involved in [the] scheme eventually went into default, and most of the properties were forced into foreclosure at huge losses for the lenders.

Id. at 51-52.  As to Lindley's involvement, the First Circuit recounted the following relevant facts "in the light most favorable to the jury's verdict":

> Levine, a real estate attorney who had been suspended from the practice of law, shared office space in Boston with Lindley, another attorney.  During Levine's suspension, he transferred components of his real estate practice in early 2005 to Lindley, who thereafter handled all property closings for Levine. . . .
>
> In mid-2005, appellants hatched their mortgage fraud scheme, which began with [certain co-defendants identifying properties, negotiating prices, and recruiting straw purchasers].  Next, aided by Lindsay MacPhee (Levine's administrative assistant), Levine, Lindley, [and two co-defendants] prepared and filed falsified mortgage loan applications, purchase-and-sale agreements, and HUD-1 settlement statements on behalf of the straw buyers, misrepresenting the straw buyers' eligibility for the loans and overstating the purchase prices of the properties. . . . Once the falsified applications were approved by unsuspecting mortgage lenders, the loan proceeds were wired to Lindley's Interest on Lawyers Trust Account ("IOLTA"), from which the actual purchase prices were paid to the sellers and the excess was disbursed to the conspirators, usually after passing through bank accounts held by Levine.  The loans secured by the properties were then permitted

---

[3] Lindley's constitutional challenges survive his release from custody and the termination of supervision.  Robson v. United States, 526 F.2d 1145 (1st Cir. 1975).

to default.  Most of the properties were forced into foreclosure, and one was burned for insurance money.

In all, twenty-one properties were involved in appellants' scheme.  For each of these properties, two separate HUD-1 forms were created, with one form reflecting the actual purchase price and the other reflecting the artificially-inflated price listed on the falsified mortgage loan application.  In addition, separate closings, presided over by Lindley, were held for many of the properties in order to distance the straw buyers from the sellers and keep secret the existence of the scheme.  By June 2006, the conspirators had earned nearly $2 million in illegal profits, commissions, and fees.

Id. at 52-53 (footnotes omitted).

Lindley was represented at trial and sentencing by Sheketoff, an experienced criminal defense attorney.  Doc. No. 1108-1 ¶ 6.  His post-verdict motion for acquittal or a new trial was denied.  Doc. No. 668.  On direct appeal, represented by different counsel, Lindley challenged the sufficiency of evidence showing "he either had actual knowledge of or was willfully blind to the mortgage fraud scheme."[4]  Appolon, 695 F.3d at 55.  On September 19, 2012, the Court of Appeals affirmed his convictions.  Id. at 52.

The Court of Appeals described evidence showing, inter alia: that Lindley had prepared conflicting documents with respect to one property, each stating that a different person would occupy the property; that Lindley had prepared an agreement providing he would hold certain funds in escrow to remedy building code violations on a property, but failed to disclose the agreement on the HUD-1 sent to the lender and ultimately transferred the funds to Levine's bank account instead of using them for repairs; that Lindley had paid a straw buyer from his IOLTA account without disclosing the payment on the HUD-1 sent to the lender; that Lindley had signed a check paying funds from his IOLTA account to a company controlled by Levine, under the

---

[4] Lindley also challenged the trial court's decision to give a willful blindness instruction and alleged that the government's counsel improperly attributed a financial motive to Lindley and assigned a value to the real estate closing practice that was not supported by the evidence. Appolon, 695 F.3d at 63-66.  The First Circuit rejected both arguments.  Id.

guise of a "fictitious construction holdback"; and that Lindley had paid a seller who had discovered a difference in the purchase prices on HUD-1s provided to him and to the buyer, but had not disclosed the payment to the lender.  Id. at 55-56.  This, the First Circuit concluded, was "more than sufficient to prove his actual knowledge beyond a reasonable doubt."  Id. at 56-57.

Alternatively, and "to emphasize the strength of the evidence against Lindley," the Court of Appeals summarized evidence regarding "a number of warning signs or 'red flags,' that, uninvestigated, suggest Lindley's willful blindness."  Id. at 57.  Examples of such "red flags" were: evidence that two sets of loan documents were prepared for all properties involved in the scheme, but not for other closings conducted by Lindley; and evidence that "Lindley conducted several closings involving repeat buyers," including buyers purporting to purchase multiple properties in a short period of time and signing occupancy affidavits for each of them.  Id.  From this evidence, the First Circuit found, a reasonable juror could have inferred Lindley "willfully blinded himself to the existence of appellants' scheme."  Id. at 57-58.

As to both actual knowledge and willful blindness, the Court of Appeals noted the plausibility of Lindley's alternative explanations for the evidence—that each incident proved only his "inattentiveness and professional incompetence"—but concluded that the inferences Lindley urged were not the only ones jurors reasonably could have drawn, and that there was "unusually strong" "evidence of Lindley's knowing participation in appellants' scheme," or, alternatively, of his willful blindness to it.  Id. at 56-58.

Lindley filed a pro se § 2255 motion in September 2013.  Doc. No. 913.  He sought and obtained permission to amend his motion thereafter.  Doc. Nos. 926, 1023.  In his amended motion, Lindley levies a host of challenges to trial counsel's performance, faulting Sheketoff for:

1.  Failing to communicate with Lindley;

2.  Failing to move to sever Lindley's trial from that of his co-defendants;

3. Waiving Lindley's right to a speedy trial without Lindley's knowledge or consent;

4. Waiving a forfeiture trial without Lindley's knowledge or consent, and failing "to challenge the ex parte restraint of [Lindley's] wife's real estate";

5. Failing to object to the admission of certain documents;

6. Failing to review all relevant evidence and conduct adequate investigation;

7. Failing to adequately cross-examine two key witnesses;

8. Requiring Lindley to supply him with paper and pens during trial and failing to order daily transcripts;

9. Failing to prepare an effective closing argument;

10. Waiving Lindley's right to a defense by resting without presenting any evidence;

11. Waiving Lindley's right to testify without Lindley's informed consent;

12. Failing to challenge the money laundering charges on grounds such as merger, sufficiency, and multiplicity;

13. Failing to move for special verdicts;

14. Having a conflict of interest stemming from demands for additional fees; and

15. Failing to prepare for and effectively argue at Lindley's sentencing.

Doc. No. 1024 at 3-10.

The government opposed Lindley's motion generally and responded specifically to a number of Lindley's contentions. Doc. No. 1108. Along with its brief, the government submitted an affidavit prepared by Sheketoff presenting a "global," but not "exhaustive," response to Lindley's assertions. Doc. No. 1108-1. Sheketoff attached emails between himself and Lindley that are pertinent to some of Lindley's complaints. Id.

In February 2016, this matter was reassigned to the undersigned.[5] Doc. No. 1138. Lindley responded to the government's brief in April 2016 with a "Request for Findings and

---

[5] The case was previously reassigned from Judge O'Toole to Judge Saylor, Doc. No. 1019, and Judge Saylor subsequently recused himself, Doc. No. 1137.

Rulings," supported by exhibits related to two grievances filed against Sheketoff with the Massachusetts Board of Bar Overseers ("BBO") and an affidavit by Lindley. Doc. Nos. 1163, 1164. The Court construes these submissions as a reply in further support of the claims set forth in his § 2255 motion.[6]

In an Order issued in February 2017, the Court scheduled an evidentiary hearing as to the following issues: "Whether trial counsel informed Lindley of his right to testify in his own defense, whether Lindley was otherwise aware of that right, and whether Lindley knowingly waived that right"; "Whether trial counsel was informed of and/or investigated Lindley's assertions that he attempted to report the mortgage fraud scheme at some point before it was discovered, and that he aborted a number of closings which he believed were suspicious"; and "Whether trial counsel and Lindley had a dispute about fees during the trial, and to what extent any such dispute impacted trial counsel's performance of his duties on behalf of Lindley." Doc. No. 1219 at 2. The Court set the hearing for March 10, 2017. Id. at 2-3. The hearing date was continued four times thereafter, each time at Lindley's request. See Doc. No. 1236 (describing the series of continuance requests).

B.    Evidentiary Hearing

On December 13, 2017, the evidentiary hearing finally proceeded. Doc. No. 1246. It lasted nearly three hours and featured testimony by Lindley and Sheketoff.[7] See generally Draft

_____

[6] The Federal Rules of Civil Procedure apply to proceedings pursuant to § 2255 only insofar as they are not inconsistent with the Rules Governing § 2255 Proceedings. Rule 12, 28 U.S.C. foll. § 2255. Because the habeas rules specifically address the manner in which the United States shall answer a § 2255 motion, Rule 5, 28 U.S.C. foll. § 2255, Lindley cannot invoke the pleading rules governing general civil cases, Fed. R. Civ. P. 8.

[7] Both parties proposed testimony by additional witnesses, Doc. Nos. 1238, 1239, but the Court did not perceive that the identified witnesses would meaningfully assist it in resolving the issues that were the focus of the hearing, Doc. No. 1240. Having considered those issues and Lindley's

Tr. Mot. Hr'g, <u>United States v. Lindley</u>, No. 08-cr-10121-LTS-2 (D. Mass. Dec. 13, 2017) [hereinafter Draft Tr.].

Lindley testified first. He became an attorney in 1993. <u>Id.</u> at 14. He described his practice as primarily civil, and said his involvement in the charged mortgage fraud scheme arose from his desire to take over Levine's real estate practice after Levine's law license was suspended. <u>Id.</u> at 15-17. Lindley was exposed to criminal law in a law school class, during an internship with the Suffolk County District Attorney's office, and through "a couple of . . . minor legal criminal things" thereafter. <u>Id.</u> at 17. He "never did a criminal trial." <u>Id.</u> He had civil trial and general legal research experience, he was aware that a criminal defendant has a constitutional right to testify, and he knew that the decision whether he should exercise that right in his trial was his to make. <u>Id.</u> at 26, 108-09.

Lindley explained his version of certain events that were the subject of his trial, including when he claims he began to suspect the existence of the charged scheme and efforts he says he made to expose it. <u>Id.</u> at 19-23. Although he admittedly saw Sheketoff daily throughout the trial and sat next to him at the defense table, Lindley described his relationship with Sheketoff as virtually devoid of communication. <u>E.g.</u>, <u>id.</u> at 25-27. According to Lindley, Sheketoff did not respond to calls and emails, refused to review summaries Lindley prepared regarding the relevant real estate transactions, declined to review notes Lindley took throughout the trial, kept Lindley "in the dark" about pretrial matters, and "stunned" Lindley by resting without presenting defense evidence. <u>Id.</u> at 25, 27, 32-33, 37-38. Lindley also testified that Sheketoff twice said he should have charged Lindley a higher fee. <u>Id.</u> at 52.

---

§ 2255 motion more generally in light of the evidence developed at the hearing, the Court remains assured that no further testimony is necessary.

The government's cross-examination of Lindley, in part, concerned subjects it would have explored during the trial, had Lindley taken the stand in his own defense. E.g., id. at 59-74 (probing the circumstances of Lindley's purported efforts to report the scheme and whether the scheme actually involved more transactions than were charged).

Two significant factors cause the Court to doubt the accuracy of Lindley's version of events. First, the record contradicts Lindley's stated recollection as to several relevant events. For example, Lindley's assertion that Sheketoff was called out of order (without notice to Lindley) and "rested before the other [defendants] put on their case[s]," id. at 37-38, 80-83, is directly refuted by the trial transcript. See Doc. No. 477 at 207 (reflecting Sheketoff's proposal on May 19, 2010 that he be permitted to rest the next day immediately after the government resting subject to an order that no co-defendant's evidence nor any government rebuttal evidence could be considered against Lindley); Doc. No. 478 at 11, 113, 157 (reflecting Sheketoff withdrew his proposal the next morning, the government rested later that day, co-defendant Levine presented a witness and rested, and only then did Sheketoff rest on Lindley's behalf). Likewise, Lindley's description of Sheketoff as having arrived "two hours late for sentencing" only to say "barely anything to the Court," Draft Tr. at 97, is at odds with the sentencing transcript. See Doc. No. 675 at 5-7, 15-18, 21, 35-39 (reflecting Sheketoff spoke at some length on various subjects during the sentencing hearing, which started only one hour late).

Lindley's written submissions also allege facts that are refuted by the record. For example, his motion asserts that "in the midst of trial," Lindley "threatened to contact" the BBO because Sheketoff was not returning his calls. Doc. No. 1024 at 7. According to Lindley, Sheketoff responded by promising to "submit his resignation the next day." Id. Emails produced by the government, however, reveal that the relevant exchange took place more than a

month after the jury returned its verdict.  Doc. No. 1108-1 at 17.  This discrepancy is meaningful, as Lindley cites the threat to resign as the reason he "submitted to [Sheketoff] completely" "[f]rom that point on," fearing that "any trouble would result in [Sheketoff] deserting [Lindley] in the middle of the trial."  Doc. No. 1024 at 7.  Given the actual timing of the interaction, it cannot explain or excuse Lindley's failure to voice the complaints he presents now to either Sheketoff or the trial judge at the time of his trial.

Second, Lindley has admitted his memory of events occurring during and around the time of his trial is, understandably, imperfect.  E.g., Draft Tr. at 32 (noting the passage of time since the relevant events and conceding he "believe[s]" a particular discussion occurred but "can't be certain"); id. at 52 (stating he could not "remember what the context was" for the references Lindley said Sheketoff made to his fee); see also id. at 47 (noting he "ha[d] the flu" and found it "hard . . . to focus on this").

These circumstances substantially undermine Lindley's credibility regarding the specific events giving rise to his claims.  As explained in the discussion that follows, § III, infra, the Court rejects much of Lindley's testimony.

Sheketoff took the stand after Lindley.  According to the BBO's website, Sheketoff has been a member of the Massachusetts bar since 1976 and never has been publicly disciplined.[8]  At the time of Lindley's trial, Sheketoff had more than thirty years of experience as a criminal

---

[8] Lindley makes much of a complaint levied against Sheketoff in 2014, Doc. No. 1163 at 9; Doc. No. 1163-2; Doc. No. 1163-3; Doc. No. 1164, and submits a copy of a non-public admonition of Sheketoff by the BBO in 2007, Doc. No. 1163-1.  In the Court's view, the complaint and the admonition have minimal relevance here.  A search of the BBO website reveals the 2014 complaint yielded no discipline, public or otherwise.  The ten-year-old admonition involved unique circumstances not presented here and appears to have expired in any event.  See Admonitions, Massachusetts Board of Bar Overseers, https://www.massbbo.org/Admonitions (last visited May 8, 2018) (explaining an "admonition is vacated and the complaint dismissed" "if the lawyer remains free of any further misconduct" for eight years).

defense attorney. Doc. No. 1108-1 ¶ 6. Sheketoff described his trial preparation, his theory of the case, investigation he undertook at Lindley's request, and the nature of his communications and interactions with Lindley. Draft Tr. at 116-30. Although he did not specifically recall his discussion with Lindley about whether Lindley should testify, he described his general practice in this respect, the reasons for his conclusion that Lindley should not testify, and his usual approach to counseling clients when he does not believe they should testify. Id. at 121, 126-27. Sheketoff also stated that his representation of Lindley was not limited by the fee he charged Lindley or by his representation of any other client. Id. at 130-31.

The Court found Sheketoff to be candid and credible in all respects.

## II.   LEGAL FRAMEWORK

A prisoner sentenced by a federal court "may move the court which imposed the sentence to vacate, set aside or correct the sentence" if: 1) "the sentence was imposed in violation of the Constitution or laws of the United States"; 2) "the court was without jurisdiction to impose such sentence"; 3) "the sentence was in excess of the maximum authorized by law"; or 4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Post-conviction relief pursuant to § 2255 is an extraordinary remedy, available only to a defendant who makes "a sufficient showing of fundamental unfairness." Singleton v. United States, 26 F.3d 233, 236 (1st Cir. 1994). "[D]efendants bear the burden of establishing by a preponderance of the evidence that they are entitled to relief." United States v. DiCarlo, 575 F.2d 952, 954 (1st Cir. 1978). To assess whether a defendant has met this burden, a court generally must accept his factual averments as true, but "need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets." United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993).

Unlike most other claims of error, which must be raised at trial and on direct review, counsel-ineffectiveness claims may be presented for the first time in a § 2255 motion.  <u>Massaro v. United States</u>, 538 U.S. 500, 504 (2003).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  To establish that his counsel was constitutionally ineffective, a defendant must satisfy <u>Strickland</u>'s well-known two-part test.  "First, the defendant must show counsel's performance was deficient,' which requires showing "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  <u>Id.</u> at 687.  "Second, the defendant must show the deficient performance prejudiced the defense."  <u>Id.</u>  Both showings are required; a failure to establish either one will defeat a defendant's post-conviction claim.  <u>Id.</u>; <u>accord</u> <u>Knight v. Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006).

As the Supreme Court repeatedly has emphasized, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task."  <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010); <u>see</u> <u>Knight</u>, 447 F.3d at 15 (establishing either of <u>Strickland</u>'s prongs is a "highly demanding" and "heavy burden").  Counsel's performance is measured objectively, considering only what is "reasonable[] under prevailing professional norms."  <u>Strickland</u>, 466 U.S. at 687-88; <u>accord</u> <u>Premo v. Moore</u>, 562 U.S. 115, 122 (2011).  The standard is "highly deferential," and courts must "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy under the circumstances.  <u>Strickland</u>, 466 U.S. at 689; <u>accord</u> <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 124 (2009).  "It is rare that constitutionally competent representation will require any one technique or approach."  <u>Cullen v. Pinholster</u>, 563 U.S. 170, 195 (2011) (quotation marks and alteration

omitted).  A strategic choice "made after thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable."  <u>Strickland</u>, 466 U.S. at 690.  The relevant inquiry, then, is not whether counsel was "prudent or appropriate," <u>United States v. Cronic</u>, 466 U.S. 648, 665 n.38 (1984), but rather whether the proceedings resulting in the defendant's conviction and sentence were fair, <u>see</u> <u>Strickland</u>, 466 U.S. at 686.

To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u> at 694; <u>accord</u> <u>Knowles</u>, 556 U.S. at 127; <u>Sleeper v. Spencer</u>, 510 F.3d 32, 39 (1st Cir. 2007).  It is not sufficient "to show that the errors had some conceivable effect on the outcome of the proceeding."  <u>Strickland</u>, 466 U.S. at 693; <u>accord</u> <u>Gonzalez-Soberal v. United States</u>, 244 F.3d 273, 278 (1st Cir. 2001).  Rather, the defendant must show that counsel's errors were "so serious as to deprive [him] of . . . a trial whose result is reliable."  <u>Strickland</u>, 466 U.S. at 687.

Of specific relevance here, "given the paramount importance of the right to testify and the small amount of time that would be required to inform the defendant of that right, . . . failure to inform a defendant of his right to testify constitutes performance outside of an objective standard of reasonable competence, and . . . is constitutionally deficient."  <u>Owens v. United States</u>, 483 F.3d 48, 58 (1st Cir. 2007).  This failure "could be prejudicial."  <u>Id.</u> at 59.  In particular, the First Circuit has held that if the defendant "was not informed by counsel of his right to testify in his own defense, was not otherwise informed of the right . . . , and would have offered genuinely exculpatory testimony, the failure of counsel to inform [the defendant] of his right to testify would be prejudicial."  <u>Id.</u> at 59-60 (footnotes omitted).

III.     DISCUSSION

Lindley has identified myriad perceived shortcomings in Sheketoff's representation of him.  The Court has construed his submissions as raising the fifteen discreet assertions of ineffectiveness listed above.  Each claim will be discussed in turn below, as will the potential cumulative impact of the alleged deficiencies.  At the outset, though, the Court endorses Sheketoff's observation that his relationship with Lindley "deteriorated rather dramatically" only "after the jury convicted him."  Draft Tr. at 133.  It makes sense that Lindley's unhappiness with the outcome of his trial might cause him to look back at the events that came before through the lens of his dissatisfaction, and to second-guess the decisions which Lindley subjectively views as having contributed to that outcome.  That Lindley's reaction is understandable, though, does not mean it has yielded legally meritorious challenges to his convictions, nor does it render his recollection of events accurate.

A.     Claims Explored at the Evidentiary Hearing

1.  Failure to Communicate

A recurring motif in Lindley's submissions is his overarching claim that Sheketoff refused to speak with him and neglected to involve him in his own defense.[9]  In particular, Lindley claims Sheketoff: "did not apprise [him] of any pretrial activity," Doc. No. 1024 at 3; "did not discuss the progress of the case with" him after an initial interview, id. at 3-4; "did not return [his] telephone calls," id. at 4; "did not notify [him] of pretrial motions or motion hearings," id.; "did not discuss the facts of the case with [him] in more than a cursory manner," id.; "did not apprise [him] of the day the prosecution would rest its case" despite knowing "in

_____

[9] Though related, Lindley's claims that Sheketoff did not counsel him regarding his right to testify or discuss with him whether to put on a defense case will be discussed separately.

13

advance," id. at 6; "disappear[ed] every day immediately after court and would not. . . agree to meet with [him]," id. at 7; and "refus[ed] to discuss a defense with [him]" and thereby "made it impossible for [him] to provide clarification" on relevant issues, id. at 9.

Lindley reiterated this theme during the evidentiary hearing. E.g., Draft Tr. at 25-27 (stating Lindley "could not get responses from" Sheketoff despite using various means of contact and had no discussions with him after daily trial sessions); id. at 75 (stating Lindley "rarely" or only "occasionally" spoke to Sheketoff during the trial). When pressed, however, Lindley admitted to various facts which are at odds with his broader assertion that he experienced radio silence from Sheketoff. Besides conceding that he sat next to Sheketoff for several hours each day throughout a trial lasting approximately thirty days, Lindley referenced specific conversations he had with Sheketoff regarding: his version of how he learned of the scheme and attempted to report it to authorities, id. at 26; whether to order daily transcripts, id. at 27, 75; real estate closing practices, id. at 32, 41; specific transactions that were central to the case, id. at 42-44, 46; witness statements, id. at 98; and locating items of evidence, such as particular checks, id. at 101. See also id. at 24 (testifying Sheketoff said on two occasions that he hadn't yet decided whether Lindley should testify); id. at 25-26, 52 (noting Lindley met Sheketoff in the cafeteria before trial each day and had lunch with Sheketoff on at least some trial days); id. at 55 (stating Sheketoff told Lindley "he thought he had incorporated" materials Lindley provided to him into the defense at trial).

In his affidavit, Sheketoff described his relationship with Lindley as "amicable," at least until the jury returned its verdict. Doc. No. 1108-1 ¶ 8. He stated he met with Lindley "on numerous occasions," "received and read many emails" from Lindley while preparing for trial, met Lindley in the courthouse cafeteria "often" on the mornings of trial days, "communicated

with Mr. Lindley regarding his case as necessary and appropriate," and received Lindley's input and explanations as to various aspects of the case. Id. ¶¶ 8, 11, 13, 14. At the hearing, Sheketoff described certain issues as to which he specifically recalled Lindley's thoughts and concerns, e.g., Draft Tr. at 119-20, noted the emails he provided with his affidavit were "not even close" to all of his correspondence with Lindley about the case, id. at 121, and described subjects which he "remember[ed] discussing . . . in detail with" Lindley, id. at 125, 129.

To the extent Lindley advances a standalone claim that Sheketoff was ineffective because he failed to communicate with Lindley or to involve him in trial preparation—assuming such a claim could ever merit relief[10]—the Court finds such a claim wholly unsupported. The Court credits Sheketoff's description of the nature and extent of his communication with Lindley. His account is supported by the emails attached to his affidavit and is consistent with the manner in which an attorney with his experience generally would approach the attorney-client relationship. The Court finds that, even if Sheketoff did not respond to each of Lindley's communications, he reviewed, considered, and used them as appropriate. Lindley's blanket assertions that Sheketoff "kept him in the dark" and persistently refused to interact with him leading up to and throughout the trial are not only patently incredible, but also are directly at odds with Lindley's acknowledgement of a number of specific, case-related discussions he had with Sheketoff.

Lindley's claim that Sheketoff was constitutionally ineffective due to a failure to adequately communicate with him is meritless.

---

[10] The Court is aware of no Supreme Court case or other federal law requiring privately retained defense counsel to respond to each of his client's telephone calls or emails, or to generally include his client in every aspect of trial preparation. The Court need not determine whether or when a lawyer's failure to respond to his client's communications might cross the line into prejudicially deficient performance, since the circumstances here are nowhere near such a line.

## 2. *Failure to Investigate*

Lindley faults Sheketoff for failing to review and investigate relevant facts. In particular, he claims Sheketoff "declined to receive or review Lindley's assembled documentary evidence," "did not investigate Lindley's aborting of four closings" or "the subsequent closing of these four transactions by other attorneys," and did not investigate "Lindley's attempt to report his suspicions . . . to the Massachusetts Commissioner of Banking prior to Lindley's request to the Boston Police Department that he be put in touch with the federal mortgage fraud task force." Doc. No. 1024 at 4.[11] At the hearing, Lindley testified that Sheketoff refused to take or review files Lindley prepared containing closing paperwork, Registry of Deeds information, and his own summaries related to each of the charged transactions. Draft Tr. at 31-33. He also described a closing in September 2006 which he terminated after the seller raised concerns about costs listed on the settlement statement and denied having signed it. Id. at 19-20. Lindley said he promptly called the mortgage company and, ultimately, cancelled three other closings that were scheduled in the following weeks. Id. at 20. According to Lindley, he also called the Banking Commissioner's office, left a message about his concerns, but never received a call back. Id. at 21, 51. Thereafter, he spoke with detectives who were investigating issues arising in a property that was sold in one of the charged transactions. Id. at 21-23. Lindley said he related these facts to Sheketoff, who declined to investigate them or explore them at trial. Id. at 23-24, 26, 51.

---

[11] Lindley also alleges Sheketoff "did not investigate appraisers" and "did not subpoena appraisers to testify." Doc. No. 1024 at 4; see also id. at 8 (listing "the appraisers for the properties at issue" among possible defense witnesses). Lindley has not explained what he believes Sheketoff could or should have learned from the appraisers, or how such information would have been material to his defense. See Rule 2(b), 28 U.S.C. foll. § 2255 (requiring petitioner to "specify all the grounds for relief" and "state the facts supporting each ground").

The record reflects that Sheketoff received in discovery all of Lindley's closing files and all relevant information from the Registry of Deeds. Id. at 76-78. According to Sheketoff, he also received from Lindley both written and verbal "explanation[s] of each and every closing," and he consulted a real estate lawyer he knew to discuss various aspects of the transactions. Id. at 117-18, 129; cf. Doc. No. 1108-1 at 8-10 (reflecting Lindley emailed Sheketoff a series of Word documents corresponding to the twenty-one transactions charged). Sheketoff recalled "discussing . . . in detail with [his] client" Lindley's interaction with Boston police after problems arose at one property, and was aware of his subsequent voluntary interviews with federal prosecutors and investigators. Draft Tr. at 125-26. At trial, Sheketoff elicited testimony from Lindsay MacPhee that Lindley "pulled the plug" on a closing in 2006 after he became suspicious about the transaction, then "called the supposed supervisor" at the mortgage company involved "to complain about what was going on." Doc. No. 466 at 179-80; see also Doc. No. 467 at 20-21 (stating another closing for the same company also was cancelled after Lindley's call). He also elicited testimony from Elizabeth Son, a straw buyer, that Lindley accompanied her during police interviews related to one of the properties she purchased pursuant to the scheme. Doc. No. 463 at 156-60. Sheketoff emphasized both of these points—the aborted closing and Lindley's cooperation—in his closing argument. Doc. No. 480 at 100-01, 104.

As an initial matter, the Court finds Sheketoff received and reviewed copies of Lindley's closing files, the corresponding lenders' files, and all relevant information recorded with the Registry of Deeds. Even assuming Lindley assembled his own set of those documents and that Sheketoff refused to accept it, he was under no obligation to collect and review a second set of documents he already possessed. In addition, the Court credits Sheketoff's testimony that he received and considered Lindley's explanations and summaries of each charged transaction.

Insofar as "Lindley's aborting of four closings" is concerned, the record establishes that Sheketoff knew of the facts Lindley has described, that he hired an investigator to interview MacPhee and another witness about whom Lindley expressed particular concern, that he developed evidence of the cancelled closings at trial through his cross-examination of MacPhee, and that he used those facts to argue in closing that the jury should conclude Lindley was not part of the scheme. Lindley has not specified what additional investigation of these facts he believes was necessary except to note that Sheketoff did not explore whether other lawyers eventually conducted the closings Lindley cancelled, nor does he demonstrate how any such investigation would have mattered.

Regarding Lindley's purported "attempt[s] to report his suspicions," nothing in the record suggests there was any investigation to be done, much less investigation that was constitutionally compelled. Lindley's "report" to the Banking Commissioner consisted of a single message left on an answering machine in September 2006. Even assuming Sheketoff could have somehow obtained a record of that message after Lindley was charged, the absence of evidence of the call does nothing to undermine the Court's confidence in the fairness of Lindley's trial or its result. A single, unanswered message left at a state agency's office would not provide meaningful evidence of a sincere attempt by Lindley to disclose suspicions of criminal conduct to authorities empowered to investigate and respond to them. As such, Sheketoff was not deficient for failing to procure evidence of the call Lindley describes. Sheketoff did ensure that evidence of Lindley's cooperation with Boston police investigators, as well as with the federal authorities investigating the crimes charged here, was put before the jury at trial.

Sheketoff's approach to reviewing, investigating, and using the relevant facts was well within the bounds of sound and reasonable strategy under the circumstances. Lindley has not

established "that constitutionally competent representation" required a different "technique or approach." See Pinholster, 563 U.S. at 195.

### 3. Attorney-Client Conflict

Lindley accuses Sheketoff of threatening to resign "in the midst of trial," of "repeatedly stat[ing] to [Lindley] that he should have charged [Lindley] an additional $200,000," and of resting without putting on a defense "so that [Sheketoff] could begin another trial for another paying client immediately." Doc. No. 1024 at 7, 9; see Doc. No. 1164 at 3 (alleging Sheketoff twice said he should have charged Lindley more, and stating Lindley "could only surmise . . . that this is why [Sheketoff] was not communicating with" him and "abruptly ended [his] case").

According to Sheketoff, his only disagreement with Lindley about his fee arose when Sheketoff asked for an unpaid $5,000 balance of his total $50,000 fee. Doc. No. 1108-1 ¶ 10. Lindley consulted his own records, confirmed the balance, and paid it. Id. Sheketoff denies having demanded any further payment from Lindley, but posits that Lindley might have been present one morning when another attorney commented that Sheketoff should have charged $200,000 for a case of this nature. Id. ¶ 11. As to his threatened resignation, Sheketoff has supplied an email reflecting the relevant comment was made weeks after the trial ended, when Lindley threatened to contact the BBO about his (incorrect and baseless) belief that Sheketoff had not filed a post-trial motion. Id. ¶ 14(g).

At the hearing, Lindley could provide no additional detail regarding Sheketoff's alleged references to additional fees. He agreed Sheketoff's description of the comment made by another attorney "may" accurately depict one of the two incidents, conceded Sheketoff never "directly ask[ed] [Lindley] to pay any additional attorney's fees," and declined to characterize the incidents as "a dispute" about fees. Draft Tr. at 52-54, 94. Sheketoff testified he "considered

the fee [he charged Lindley] to be a professional courtesy to another lawyer" and "a complete irrelevancy" that did not restrict the manner in which he defended Lindley. Id. at 130-31.

The record is devoid of support for Lindley's claim that a conflict with Sheketoff—about fees or anything else—deprived him of his constitutional right to the effective assistance of counsel. The only evidence of any threat by Sheketoff to resign shows that the relevant comment was made long after the trial had ended. Sheketoff did not, in fact, resign, and there is no evidence that Sheketoff's threat or the dispute from which it arose had any bearing on his defense of Lindley. Similarly, the only evidence of any suggestion that Sheketoff should have charged a higher fee relates to a comment made by another lawyer (not Sheketoff). Sheketoff did not, in fact, demand a higher fee, and there is no evidence that Sheketoff's fee had any bearing on his defense of Lindley, that the fee motivated Sheketoff to represent another client with a trial starting after Lindley's, or that the impending trial impacted Sheketoff's defense of Lindley. In fact, the only credible evidence before the Court in this regard is Sheketoff's testimony that his defense of Lindley was not limited by the fee he received or by the trial he was scheduled to begin next.

Lindley's ineffectiveness claim arising from an alleged conflict with Sheketoff fails.

### 4. Right to Testify

The final claim explored at the evidentiary hearing, and perhaps the most prominent one in Lindley's petition, is Lindley's contention that he did not knowingly and voluntarily waive his right to testify in his own defense. Echoing Lindley's general assertion that Sheketoff failed to communicate with him, Lindley claims Sheketoff "waived [Lindley's] right . . . to take the stand in his own defense, without ever consulting [Lindley] on this point." Doc. No. 1024 at 6. According to Lindley's pro se motion:

The only time Attorney Sheketoff ever mentioned the defendant taking the stand was to tell Lindley that he, Sheketoff, had not yet made up his mind whether to put the defendant on the stand. The defendant responded that he was looking forward to his attorney's advice. The lawyer admitted of no discussion of this question again. Mr. Sheketoff never informed his client that he had a right to take the stand and that the decision was the client's not the attorneys [sic]. Indeed, Sheketoff made it clear that the decision was for him, the attorney, to make.

Id. at 7-8. In subsequent filings, Lindley elaborated:

Sheketoff . . . never discussed me testifying other than to tell me that he had not yet decided whether to have me testify or not. . . .

As I understand it, it is irrelevant whether I knew intellectually that I had a right to testify. I knew little about criminal process, and I relied . . . upon the counsel of my attorney. . . . Had there been [a discussion between us about a defense], I can only assume, at some point Sheketoff would have discussed with me whether I would testify. . . .

If Sheketoff and I had discussed this, I would have listened to his advice and made a decision whether to testify. I do not know what course our discussion would have taken, but I see little reason why I would not have had to testify, and, if so, I would have taken the stand. I was not looking forward to testifying, and I would have preferred not to, but I would have done whatever was necessary to get my story out – including testifying. I needed the counsel of my criminal defense attorney.

Doc. No. 1164 at 1-2.

Sheketoff responded to this claim in his affidavit, stating he had "no specific memory of when [he] discussed with Mr. Lindley his right to testify at trial, or not to testify," but citing his "long-standing practice in criminal cases to advise [his] clients of their right to testify and that the client ultimately chooses whether to testify." Doc. No. 1108-1 ¶ 23. Sheketoff also observed that "Lindley was a practicing attorney who had handled criminal cases." Id. He attached an email Lindley sent to him after closing arguments on May 24, 2010, in which Lindley wrote: "If [the prosecutor] had indicated he was going to claim I made $40,000 a month, then *we* might have made a decision to put me on the stand." Doc. No. 1108-1 at 15 (emphasis added). To

Sheketoff, this comment "confirms that [he and Lindley] had discussed" whether Lindley should testify.  Doc. No. 1108-1 ¶ 23.

At the evidentiary hearing, Lindley testified that "the extent of" his "face to face discussions" with Sheketoff about whether he should testify at trial were Sheketoff's comments on two occasions that he "ha[d]n't decided whether to put [Lindley] on the stand yet."  Draft Tr. at 24-25.  Lindley characterized his May 24, 2010 email as "just trying to get a response from" Sheketoff, and as his "way of asking for an explanation as to why [he] wasn't called" as a witness.  Id. at 30-31; see also id. at 106 (describing the email as Lindley "trying to posture [himself and Sheketoff] as a unit, working in the same direction, for the same thing" in order to "find out why we didn't put me on the stand").  Eventually, Lindley conceded that he "knew [he] had a right to testify," that he knew the decision whether to testify was his to make, that he understood these facts at the time of his trial, and that Sheketoff had not "prevented" him from testifying.  Id. at 108-09.

Sheketoff testified he "believe[s]" he discussed with Lindley the right to testify, and thinks the May 24, 2010 email from Lindley "corroborates that."  Id. at 121.  He said his advice, which he "believe[s] [Lindley] accepted," was that Lindley should not testify.  Id.  This advice, Sheketoff explained, was based on his assessment of three relevant factors.  First, he was concerned that offering separate "explanations" and "excuse[s]" for each of the transactions charged would "start[] to add up."  Id. at 126.  Second, citing his experience with criminal trials, fraud cases, and decisions about whether clients should testify, Sheketoff said "there are people that are going to make better witnesses, and there are people that are not"; having come to know Lindley, Sheketoff "thought he would not make a good witness."  Id. at 126-27.  And third, Sheketoff noted "all the problems with [a defendant] testifying," including his belief that it

means "the whole case becomes about [the defendant], not about whatever happened before," leading to "a serious problem" "if the jury doesn't believe" the defendant. Id. at 127. Sheketoff understood that making the ultimate decision, though, is a defendant's "constitutional right." Id.

The Court rejects Lindley's claim that Sheketoff failed to advise him regarding his right to testify. First, the credible evidence establishes that Sheketoff followed his usual practice in this case by speaking to Lindley about his right to testify and explaining why he should not invoke that right under the circumstances here. The Court credits Sheketoff's description of his general practice and notes his considerable experience navigating this question over the course of decades spent representing criminal defendants at trial. The Court finds Lindley's May 24, 2010 email saying "we might have made a decision to put me on the stand" confirms that Sheketoff and Lindley previously had discussed—together—whether Lindley should testify, and decided—together—that he would not. Lindley's assertions to the contrary are incredible, as is his alternate explanation for the words he wrote in the May 24, 2010 email. Consequently, the Court concludes Sheketoff informed Lindley of his right to testify.[12]

Even if the Court were to find Sheketoff failed to discuss the matter with Lindley, the claim still would fail because Lindley has not established prejudice. Lindley is a lawyer. He admittedly understood he had a right to testify, and that the right was his to invoke or to waive.

---

[12] Lindley has cited a decision by another session of this Court addressing a claim that Sheketoff and another defense lawyer were ineffective for failing to inform a defendant of his right to testify. See Doc. No. 1163 at 8 (citing Owens v. United States, 236 F. Supp. 2d 122 (D. Mass. 2002)). That case, however, presented materially different circumstances. There, Sheketoff submitted an affidavit stating he did "not remember ever discussing with [the defendant, a leader of a drug distribution ring and not a lawyer,] that he had a right to testify and whether he wished to testify," Owens, 236 F. Supp. 2d at 127, 144; see id. at 144 n.14 (lamenting "[t]he spectacle of extremely competent criminal defense counsel suggesting post-trial that they were incompetent" in order to support a post-trial constitutional challenge). Here, Sheketoff credibly professes no "specific" memory of "when" he discussed this issue with Lindley, but explains in detail why he believes such a conversation took place, and points to a document corroborating his belief.

This fact is not "irrelevant," as Lindley suggests.[13]  See Owens, 236 F. Supp. 2d at 144 (finding no prejudice from failure of counsel to inform client of right to testify where trial court explained right during preliminary jury charge in client's presence), rev'd in part on other grounds, 483 F.3d 48, 59-60 (1st Cir. 2007) (considering whether the client "was unaware of his right to testify" or was "otherwise informed of the right"), abrogated on other grounds, Weaver v. Massachusetts, 137 S. Ct. 1899 (2017).[14]

Moreover, Lindley has not established he would have testified had he received Sheketoff's advice, let alone that he would have offered "genuinely exculpatory testimony."  See Owens, 483 F.3d at 59-60 & n.9 (permitting habeas court to "assess the credibility of the defendant's assertion that he would have testified").  Lindley expressed reluctance to testify, writing that he "would have preferred not to."  Doc. No. 1164 at 2.  He also stated he "would have listened to [Sheketoff's] advice."  Id.  Though Lindley "s[aw] little reason why [he] would not have had to testify," Sheketoff provided several eminently sensible reasons.  The record does not persuade the Court that Lindley would have insisted on testifying in the face of unequivocal advice to the contrary and at the risk of exposing himself to cross-examination on topics including numerous transactions investigated but not charged by the government, facts undermining his claim that he diligently attempted to report the scheme to the authorities, and his disbursement of substantial funds from his professional account to his co-conspirators.

---

[13] The First Circuit has not required "trial counsel [to] go through any specific routine or formal waiver process," deciding "only that counsel must have some sort of conversation with his . . . client informing him . . . of the right to testify so that the client can make a knowing and informed decision regarding that right."  Owens, 483 F.3d at 60 n.10.  It would be reasonable for a defense attorney to assume that a client who is a practicing lawyer is generally aware of his basic constitutional rights, and to tailor his discussion of this particular right accordingly.

[14] Lindley has suggested his ineffectiveness claim arising from his right to testify alleged a structural error "for which no prejudice need be shown," Doc. No. 1247 at 3, a proposition which finds no support in Weaver or any other binding precedent of which this Court is aware.

All told, Lindley has not established a counsel-ineffectiveness claim flowing from a violation of his right to testify.

B.     Remaining Claims

*1.  Failure to Seek Severance*

Lindley claims Sheketoff was ineffective because "[h]e did not move to sever defendant Lindley from trial with codefendants even though the prosecution's basis for trying Lindley was willful blindness while its theory for all other defendants was active and knowing participation." Doc. No. 1024 at 3.  He has not developed this argument any further in his submissions, nor has he cited a single legal authority in support of this claim.  According to Sheketoff, he filed no motion to sever because he "did not see grounds for a severance."  Doc. No. 1108-1 ¶ 15.

Sheketoff's decision not to seek severance was objectively reasonable.  The law strongly favors joint trials for defendants who are indicted together, especially where the defendants are charged with conspiracy.  United States v. Soto-Beniquez, 356 F.3d 1, 29 (1st Cir. 2003). Lindley has not established that his right to a fair trial was compromised due to his facing trial alongside his coconspirators, and nothing in the record suggests such a finding would be warranted here.  Cf. Appolon, 695 F.3d at 54-55 (discerning no error in denial of motion to sever filed by one of Lindley's co-defendants).  Moreover, the distinction Lindley cites as justifying severance—that he was the only conspirator as to whom the government sought to prove willful blindness, rather than actual knowledge—is demonstrably false.  The government pursued theories of actual knowledge <u>and</u> willful blindness as to Lindley, and the First Circuit concluded the evidence was sufficient to permit conviction on <u>both</u> theories.  <u>Id.</u> at 55-58 (describing "evidence of Lindley's knowing participation" as "unusually strong and more than sufficient to prove his actual knowledge beyond a reasonable doubt").  Moreover, the government similarly

pursued—and the First Circuit endorsed—the same two theories as to one of Lindley's coconspirators.  Id. at 64.

In these circumstances, Sheketoff's decision not to seek severance was reasonable.

## 2. *Speedy Trial*

Lindley claims Sheketoff "waived [Lindley's] right to a speedy trial without [his] knowledge or consent."  Doc. No. 1024 at 4.  Again, Lindley has not developed this argument in his submissions.  In response, Sheketoff noted that Lindley was free on bail pending trial, that counsel for Lindley's co-defendants had consented to the exclusion of time for speedy-trial purposes, and that the pretrial continuances were in Lindley's best interests "for various reasons including the time needed to prepare for trial involving voluminous materials and numerous properties."  Doc. No. 1108-1 ¶ 16.

Not only is Sheketoff's explanation inherently reasonable given the complexity of this case, Lindley's suggestion that his "knowledge [and] consent" was required before Sheketoff could consent to such exclusions is wrong.  See United States v. Gates, 709 F.3d 58, 65-66 (1st Cir. 2013) (holding "defense counsel has the power to seek [a Speedy Trial Act] continuance without first informing his client or obtaining his client's personal consent").  Indeed, so long as one or more of Lindley's co-defendants (or their counsel) sought or consented to a continuance, the resulting pretrial delay was excludable regardless whether Lindley or Sheketoff consented. See 18 U.S.C. § 3161(h)(6) (excluding from speedy trial computations "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted").[15]

As such, Sheketoff's consent to pretrial continuances was not deficient performance.

---

[15] When Lindley was indicted, this provision appeared in subsection (h)(7) of 18 U.S.C. § 3161.

### 3. *Forfeiture*

Lindley claims Sheketoff "waived trial on the issue of forfeiture without apprising Lindley of his right to trial on this issue pursuant to Federal Rule of Criminal Procedure 31(e)[16] – and did not obtain either oral or written waiver from [Lindley] on this matter." Doc. No. 1024 at 4. He further faults Sheketoff for failing "to challenge the ex parte restraint of [Lindley's] wife's real estate . . . with no showing of probable cause that the assets were subject to forfeiture, although all of the real estate was purchased years prior to the alleged criminal acts." Doc. No. 1024 at 7. Once again, Lindley has offered no other facts or legal argument to support this claim. In fact, Lindley does not even repeat the allegation regarding his wife's property in his "Request for Findings." See generally Doc. No. 1163. Sheketoff answered that he "saw no motion to file concerning the forfeiture of Mr. Lindley's assets," and noted he "never represented Mr. Lindley's wife and had no standing or obligation to file any motion requesting a hearing on the forfeiture of her assets." Doc. No. 1108-1 ¶¶ 17-18.

Lindley had neither a constitutional nor statutory right to a jury trial on the forfeiture allegation because a money judgment, and not forfeiture of specific property, was at issue. See Libretti v. United States, 516 U.S. 29, 49 (1995) (finding no constitutional right to a jury trial regarding forfeiture); United States v. Ponzo, 853 F.3d 558, 589 (1st Cir. 2017) (interpreting Fed. R. Crim. P. 32.2(b)(1)(A) and (b)(5)(A) and finding no statutory right to a jury trial as to a personal money judgment). Insofar as his complaint regarding his wife's property is concerned, Lindley has not articulated a cognizable claim that Sheketoff failed to do anything he should

---

[16] The rules regarding forfeiture were consolidated and moved to Rule 32.2 in 2000.

have done to contest unidentified restraints on unspecified property belonging to someone Sheketoff did not represent.[17]

In sum, Lindley has not shown deficient performance by Sheketoff with respect to the forfeiture allegations.

### 4. Failing to Challenge Documentary Evidence

Lindley claims Sheketoff should have "challenge[d] the admissibility of copies of records purportedly created by lenders," "insist[ed] upon the production of original documents," and challenged the testimony "of former employees of lenders who had no familiarity with the documents they were purportedly authenticating and who could not establish a chain of custody for the documents." Doc. No. 1024 at 4. In support of these claims, Lindley asserts: that original copies of mortgage applications prepared by brokers would have shown that he "had zero input into these applications" and could not have changed the documents prepared by lenders, id. at 8; that the only witnesses called by the government as representatives of lenders had not seen the original applications and were not competent to testify about them, id. at 9; and that no witnesses called were able to testify that "the files used at trial were complete, were accurate, and had not been tampered with," Doc. No. 1164 at 4. See also Doc. No. 1163 at 7-8.

Sheketoff explained that he "made no objections to admissible documents that were offered in evidence in copy form" because "the Federal Rules of Evidence permit the admission of copies." Doc. No. 1108-1 ¶ 19. In his view, "contesting frivolous evidentiary issues wastes the jury's time and engenders bad will." Id. The government supplemented Sheketoff's response by noting that the relevant mortgage files were authenticated by a witness with personal

---

[17] To the extent this assertion was intended to support Lindley's claim regarding a fee dispute, see Doc. No. 1024 at 7 (suggesting the restraint on his wife's property prevented Lindley "from obtaining money for potential attorney's fees), it does not alter the Court's analysis of that claim.

knowledge, that the same witness established the path those files travelled from the lender to the closing and back again, and that evidentiary objections raised by other defense counsel were overruled.[18]  Doc. No. 1108 at 16.

To the extent Lindley asserts that the lenders' mortgage files or the testimony of the lenders' representatives regarding those files should not have been admitted as evidence at trial, he is wrong.  The Rules of Evidence generally permit documents, including copies thereof, to be offered as evidence, assuming they are accompanied by testimony properly authenticating them. See Fed. R. Evid. 901(a), 901(b)(1), 1003.  The record in this case establishes that the relevant mortgage documents were properly admitted.

Various defense counsel objected to the admission of the lenders' files, noting possible challenges to their accuracy and contesting the ability of the witnesses called as keepers of records to authenticate the documents and establish they were business records.  E.g., Doc. No. 456 at 79-80, 109-10, 126; Doc. No. 457 at 99-107, 134-43.  Sheketoff joined in those objections, commenting specifically on the keeper-of-records question.  Doc. No. 457 at 135-36; see also Doc. No. 469 at 55-56, 58-62 (reflecting objection by Sheketoff when photocopy of settlement statement bearing Lindley's signature was admitted through co-conspirator).  The trial court ultimately (correctly) admitted the documents for a limited purpose and advised counsel that their remaining challenges were fodder for cross-examination, not grounds for exclusion.

---

[18] The government incorrectly identifies Elizabeth Son as the relevant witness, Doc. No. 1108 at 16, causing Lindley to attack Son's ability to authenticate and testify about the files, see Doc. No. 1164 at 3-4 (appropriately questioning Son's experience with and knowledge of mortgage files, but also gratuitously describing Son as "mentally deficient" and "uneducated").  A review of the trial transcript reveals that the relevant files actually were authenticated and admitted through Pamela Thomas, Diane Taylor, Richard Pannone, Maria Rispoli, Michael Sund, Karen Consaga, Robert Buchanan, Adam Loskove, and Jacklyn Kongslien, each of whom was a representative of a lender associated with one or more charged transactions.

Doc. No. 456 at 79-80, 109-10, 126; Doc. No. 458 at 8, 44; Doc. No. 459 at 39; Doc. No. 464 at 105. The trial transcript reflects the witnesses were subject to substantial cross-examination by more than one defense attorney suggesting a lack of personal knowledge about the records and the manner in which they were prepared and kept. E.g., Doc. No. 457 at 5-15, 29-36, 57-58.

In this context, Sheketoff's approach to the relevant evidence, which included doing some of the very things Lindley says he should have done, was objectively reasonable.

To the extent Lindley challenges the manner in which Sheketoff responded to the proper admission of the relevant documents and testimony—for example, by suggesting Sheketoff should have demonstrated Lindley's lack of involvement in preparing the relevant paperwork or his lack of knowledge about whether the information in the documents was true—the extensive cross examinations of the lenders' representatives accomplished that. See, e.g., Doc. No. 457 at 23, 52, 109-16 (reflecting that the closing attorney was not involved in preparing closing paperwork, did not receive paperwork until after the lender had reviewed and verified the information provided by a borrower, and did not receive appraisal reports); Doc. No. 465 at 53 (explaining that closing attorney's only role with respect to verifying information about borrower is to "validate that the individuals coming to closing" are who they say they are); see also Doc. No. 480 at 109-10 (reflecting Sheketoff argued in closing that Lindley's time actually handling closing documents was limited, and that he had no role in verifying information provided by borrowers to lenders or in preparing the closing files).

The Constitution did not require a different approach. Pinholster, 563 U.S. at 195.

### 5. Cross-Examination of Key Witnesses

Lindley claims Sheketoff's cross-examinations of his former assistant, Lindsay MacPhee, and cooperator Andre Lamerique were prejudicially deficient. In particular, he criticizes

Sheketoff's failure "to press the issue" when MacPhee wept on the witness stand after "admitt[ing] that she was being paid by one of Lindley's co-defendants to prepare and submit to Lindley two sets of closing documents, one legitimate and one false." Doc. No. 1024 at 4. He goes on to propose facts which he believes further questioning of MacPhee "would have established." Id. at 4-5. Lindley faults Sheketoff for failing to ask Lamerique whether a conversation which he testified took place in Lindley's presence was conducted in English.[19] Id. at 5. In response, Sheketoff simply notes that he "did conduct cross examination of relevant witnesses that were called by the Government." Doc. No. 1108-1 ¶ 20. The government observes that Sheketoff "pointedly cross-examined relevant Government witnesses," and argues that Lindley has not explained how his "quibble[s]" with particular aspects of those examinations shows Sheketoff's strategic decisions were "objectively unreasonable." Doc. No. 1108 at 7.

As must be apparent by now, this Court has carefully reviewed the entire transcript of Lindley's trial. The record directly undermines Lindley's stated recollection and, thus, his claim. Sheketoff extensively cross-examined MacPhee and Lamerique, yielding testimony favorable to Lindley. For example, Lamerique agreed he had been instructed not to reveal certain information about the charged scheme to Lindley. Doc. No. 471 at 138-39. MacPhee admitted that she prepared and maintained the closing files; that she was the primary contact person for lenders, brokers, and borrowers; that Lindley received a file just before the scheduled closing and returned it to her soon thereafter; that she changed settlement statements, wrote checks, and

---

[19] Lindley's petition does not identify the substance of the conversation. Doc. No. 1024 at 5. The government elicited testimony from Lamerique about two conversations implicating Lindley—an argument with a seller at a closing, and a comment by Lindley that Levine was not to be trusted. Neither involved circumstances reasonably suggesting that a language besides English was used. Sheketoff challenged the testimony about both conversations. See Doc. No. 480 at 111-12. At the hearing on Lindley's § 2255 motion, Lindley was unable to flesh out his vague attack on Sheketoff's examination of Lamerique. Draft Tr. at 47.

endorsed and deposited checks in Levine's accounts at Levine's direction, without informing

Lindley; and that Lindley thought of her as a daughter. In other words, Sheketoff did, in fact,

elicit (and argue in closing) nearly all of the facts Lindley faults him for not eliciting.

To the extent Lindley has identified facts not specifically adduced at trial (for example,

that MacPhee "prepared over 300 perfectly legitimate sets of closing documents while working

for" Lindley, Doc. No. 1024 at 5), Sheketoff's decisions about how to conduct his cross-

examinations fell squarely within the bounds of strategic determinations traditionally reserved

for defense counsel. The trial transcript establishes that Sheketoff's approach was not only

reasonable "under prevailing professional norms," Strickland, 466 U.S. at 687-88, but was well-

conceived. Accordingly, the cross-examinations of MacPhee and Lamerique do not support a

claim of counsel ineffectiveness.

### 6. *Pens, Paper, and Transcripts*

Lindley broadly claims Sheketoff "came to court unprepared," specifying only that he

"repeatedly asked [Lindley] to supply him with paper and pens," and that he "failed to order

daily transcripts" like counsel for Lindley's co-defendants did. Doc. No. 1024 at 5. Sheketoff,

understandably, does not dignify the former assertion with a response; as to the latter, he states

that the lack of "daily transcripts had no impact on [his] ability to mount a defense," as he could

access "transcripts through co-counsel." Doc. No. 1108-1 ¶ 21. The government urges that

requests "to borrow a pen or pad of paper cannot possibly be a slight so grave as to warrant

vacatur of" Lindley's convictions, nor could Sheketoff's reliance on co-counsel for transcript

copies when needed. Doc. No. 1108 at 8.

These complaints barely merit discussion. This Court can imagine no circumstances in

which a lawyer's request to borrow a pen and paper ever could infect a trial with error of

constitutional proportions.  And, the Court is aware of no legal support for finding counsel constitutionally ineffective for relying on co-counsel for (free) access to transcripts.

### 7.  *Preparation of Closing Argument*

Building on his complaint regarding transcripts, Lindley claims Sheketoff failed to use Lindley's daily trial notes when preparing his closing argument.  Doc. No. 1024 at 5.  He also criticizes Sheketoff for failing to return in closing to a theme established in his opening statement—an invitation to the jury to "follow the money"—and for failing to mention the testimony of a government witness that Lindley "was not included in the apportionment of the swindled funds."  Id. at 5-6.  In Sheketoff's view, he did include the money-related theme in his closing, but he notes that the government's theory as to Lindley was one of "indirect benefit" ("more business for which he was paid") rather than direct receipt of the "swindled funds."  Doc. No. 1108-1 ¶ 22.

Lindley's assertions that Sheketoff did not use his daily trial notes while preparing his closing cannot, without more, support a constitutional challenge.  No rule—constitutional or otherwise—requires an attorney to use particular materials in preparing a closing argument.  And, Sheketoff referenced or summarized specific testimony by nearly a dozen trial witnesses during his closing argument, demonstrating his substantial familiarity with and grasp of the evidence adduced at trial.  See generally Doc. No. 480 at 100-12.

Furthermore, the transcript directly refutes Lindley's claim that Sheketoff's closing did not reference themes and evidence about the distribution of the scheme's proceeds.  After responding to the prosecutor's earlier closing argument, Sheketoff explicitly returned to the three themes he explored in his opening statement: "trust," "necessity," and "the splitting of proceeds." Doc. No. 480 at 104-05; see Doc. No. 456 at 22-24 (referencing the same "[t]hree interlocking

things"). Sheketoff stressed that the government's evidence showed Lindley had not profited from the scheme the way his co-conspirators had. E.g., Doc. No. 480 at 105 (noting the government's auditor testified "that not one nickel of the buck goes to my client," that "Lindley would have made the same amount of money" if the transactions had been legitimate as he did through the fraudulent scheme, and emphasizing Lindley "didn't get a penny"); id. at 112 (ending by repeating Lindley "didn't profit a nickel from it").

Lindley makes no other specific complaints about Sheketoff's closing, and the Court's review of itsuggests none. Put simply, there is not a shred of support for Lindley's claim that Sheketoff's closing argument was deficient.

        *8. Failure to Present a Defense*

Lindley claims Sheketoff "waived [his] right to a defense of any kind" without discussing the matter with Lindley or obtaining his consent. Doc. No. 1024 at 6. According to Lindley, Sheketoff knew in advance when the government would rest, arranged to be "called out of sequence for purposes of resting his client's case" at that time, and never alerted Lindley to the expected timing or the chosen strategy. Id.; see Draft Tr. at 37-38 (stating Lindley first learned Sheketoff would not put on a defense case at the time he rested). Lindley asserts that "there were several defense witnesses who could have been called," including a member "of the government's mortgage fraud team," the investigator hired by Sheketoff, co-conspirators who were charged and had pled guilty before trial, "the appraisers for the properties at issue," and police officers with whom Lindley met when he was assisting Elizabeth Son.[20] Doc. No. 1024 at 8; see also Draft Tr. at 38 (describing co-defendant statement to government investigators that

---

[20] Lindley also lists Lindsay MacPhee, but she did testify over three trial days and was cross-examined by all defense counsel. To the extent Lindley alleges Sheketoff's cross-examination of her was inadequate, the Court has rejected that assertion.

was not offered at trial). He also has suggested an expert in real estate closing practices should have testified about topics including the closing attorney's lack of control over the mortgage application and appraisal processes. Doc. No. 1024 at 8-9; Doc. No. 1238 at 1-2.

Sheketoff's theory of defense in this case was that, "at worst, [Lindley] was negligent, [and] that he had no intent to commit any fraud of any kind." Draft Tr. at 120. He advanced that theory by cross-examining relevant witnesses called by the government, deciding in his "professional judgment" not to "call defense witnesses." Doc. No. 1108-1 ¶ 20. Sheketoff made "a strategic decision" not to call a real estate expert, based on his view that "the real issue in the case was whether there was willful blindness," and his concern that having an expert go through twenty-one transactions on both direct and cross-examination would render it "difficult to justify so many different issues." Draft Tr. at 122.

Once again, the record eviscerates Lindley's claim. First, if Lindley truly was "stunned" when Sheketoff rested without calling the witnesses Lindley has identified, his reaction suggests that the willful blindness jurors apparently attributed to him was not limited to the fraudulent scheme charged in the case. He admittedly was present in the courtroom, sitting beside Sheketoff, every day of his trial. Id. at 25, 38, 74-75. The transcript reflects that on May 12, 2010—more than a week before the government rested its case—Judge O'Toole reviewed the status of the case with all counsel after the jury had been excused for the day, but while court remained in session. At that time, Sheketoff stated that he anticipated calling at most one brief witness to address a single check, and that he would do so only if the government's summary witness was unable to provide the relevant information. Doc. No. 474 at 205-06. Sheketoff made similar representations during the same sort of scheduling discussions on May 18 and 19, 2010. See Doc. No. 476 at 243-44 (reiterating that Sheketoff expected to present at most only

limited testimony on two or three discrete subjects); Doc. No. 477 at 207 (stating Sheketoff would not be calling witnesses "[u]nless something changes on cross" of the government's summary witness).[21]

The Court presumes Lindley was present, seated next to Sheketoff, when these representations were made, as they occurred in open court, on the record, before Judge O'Toole adjourned for the day, when only the jurors had been excused from the courtroom.  Although these exchanges do not establish Sheketoff discussed with Lindley his strategy concerning whether to put on defense evidence, they do demonstrate Lindley had reason to know Sheketoff intended to present little or no defense evidence—and, that Lindley was aware of this well before Sheketoff rested on May 20, 2010.[22]  In these circumstances, the Court finds Lindley's description of the events relevant to this claim, and his assertion that he was "stunned" when Sheketoff rested, to be patently incredible.

Second, the record demonstrates that most, if not all, of the topics Lindley suggests Sheketoff should have included in a defense case were explored at trial in some fashion (and, in many cases, were addressed specifically in Sheketoff's closing).[23]  See, e.g., Doc. No. 457 at 23, 52, 109-16 (reflecting testimony that lender, not closing attorney, prepares many closing

---

[21] Lindley, presumably, had advance notice of when the government's case would end, as that question was the subject of the same scheduling discussions.  At 5:33 a.m. on May 20, 2010, the day the government would rest and defense evidence would begin, Lindley emailed Sheketoff a draft of a closing argument without raising any concerns about the defense strategy.  Doc. No. 1108-1 at 12.

[22] It certainly would have been reasonable for Sheketoff to assume that the attorney he was representing, and who was sitting next to him in court when these straightforward representations were made, was hearing and understanding them.

[23] The same is true for most of the facts described in the affidavit of the attorney Lindley proffers as an expert in real estate closing practices.  Doc. No. 1245.  The Court notes that the proffered expert does not claim to have experience or expertise in criminal defense strategy or trial practice, nor has she reviewed any portion of the trial testimony.  As such, this Court accords no weight to her affidavit and finds no reason to believe live testimony from her would be helpful.

documents); Doc. No. 466 at 179-80 (reflecting testimony by MacPhee that Lindley cancelled closings after becoming suspicious about the relevant mortgage broker); Doc. No. 471 at 137-39 (reflecting testimony by Lamerique that he had been told by Levine not to discuss things with Lindley, and that Levine had directed him to instruct straw buyers not to ask Lindley questions during closings "because Lindley would freak"); Doc. No. 478 at 112 (reflecting stipulation that Lindley cooperated with government investigators).

Third, although he has listed "several defense witnesses who could have been called," Doc. No. 1024 at 8, Lindley has not described the testimony he believes they would have offered, never mind how such testimony would have been so critical to his defense as to render Sheketoff's decision not to call them prejudicially ineffective.[24] Nor has Lindley shown that Sheketoff's theory of the case or his perception of the risks of calling an expert to discuss each charged transaction were unreasonable. Indeed, Sheketoff's theory of defense and the concerns he articulated seem exceedingly rational to the Court in the circumstances presented here.

Lindley has not established that Sheketoff's strategic decision to mount a defense by cross-examining government witnesses and arguing from evidence adduced during the government's case-in-chief, rather than by presenting additional defense evidence, was remotely deficient, let alone prejudicially so.

### 9. *Legal Challenges to Specific Charges*

Lindley claims Sheketoff should have sought dismissal of the money laundering charges on two grounds: first, that they merged with the wire fraud charges; and second, that "no

---

[24] At the hearing, Lindley submitted two memoranda produced by the investigator Sheketoff hired, reflecting August 2007 interviews of MacPhee and Lori Kysilovsky. The Court can discern nothing significant in them beyond the facts to which the two women testified at trial. As such, it is not clear how testimony by the investigator would have been helpful to Lindley.

evidence was offered that the money purportedly laundered was profit." Doc. No. 1024 at 6. He also argues that the indictment was "multiplicitous," "raising the specter of multiple punishment[s] for a single offense" of "obtaining fraudulent loans to purchase real estate securing the loans," by transforming "[t]wenty-one transactions" into "sixty-three counts." Id. at 7. Lindley has not cited a single legal authority supporting these assertions, which he does not pursue in his "Request for Findings." Doc. No. 1163; see Doc. No. 1024 at 6 (stating summarily that the "law at the time the crime was committed mandates that only profits can be laundered").

The First Circuit has rejected precisely the arguments Lindley faults Sheketoff for not pursuing here. See United States v. Foley, 783 F.3d 7, 14-17 (1st Cir. 2015) (finding no merger of money laundering and wire fraud charges in case against participant in mortgage fraud scheme, and "no reason to" define "'proceeds' as profits"); United States v. Smith, 46 F.3d 1223, 1234 (1st Cir. 1995) (explaining that conspiracy charge normally does not merge with underlying offenses, separate fraud counts arising in single scheme to defraud but involving different properties and amounts of money are not multiplicitous, and money laundering and fraud are separate and distinct crimes).

Sheketoff's failure to raise meritless merger or multiplicity challenges was not deficient performance under Strickland.

### 10. Special Verdicts

Lindley claims Sheketoff "failed to move for special verdicts, although the offense alleged against [Lindley] could have been committed by alternate means." Doc. No. 1024 at 7. According to Lindley, because forfeiture was at stake, "special verdicts [were] required to avoid any confusion as to the extent of the penalty." Id. None of Lindley's submissions provide further insight into this claim. In response, the government urges that the Federal Rules of

Criminal Procedure call for special verdict forms only when forfeiture of specific property is sought.  Doc. No. 1108 at 14.

"Special verdicts are not required in criminal cases."  <u>United States v. Edelkind</u>, 467 F.3d 791, 795 (1st Cir. 2006).  Even when such a form is used, "there is no automatic requirement that [it] include every element of the offense so long as the jury is instructed as to all elements."  <u>Id.</u> Special verdict forms "listing each property subject to forfeiture" are necessary only in cases requiring a jury to determine "the forfeitability of specific property," to solicit the jury's assessment of "whether the government has established the requisite nexus between the property and the offense committed by the defendant."  Fed. R. Crim. P. 32.2(b)(5).  Lindley has not questioned the adequacy of the trial court's jury instructions as to the elements of any charge against him.  As discussed above, the forfeiture allegations in this case involved only a money judgment as to Lindley and, thus, did not trigger the right to a jury trial or a special verdict under Rule 32.2.

In these circumstances, the absence of special verdicts cannot provide fodder for a constitutional challenge to Sheketoff's performance.

### 11. Sentencing

Finally, Lindley claims Sheketoff "did not prepare for sentencing."  Doc. No. 1024 at 9. He supports this blanket assertion with a series of complaints, claiming Sheketoff: "excused himself and left [Lindley] alone" during his presentencing interview; started a meeting with a sentencing consultant before Lindley arrived; spoke to the consultant "in technical language" about the sentencing guidelines, "a topic of which [Lindley] was totally ignorant"; failed to object to the draft presentence report despite "detailed" input from Lindley; arrived two hours late for the sentencing; and "spoke practically nothing" on Lindley's behalf at sentencing.  <u>Id.</u> at

9-10.  Per Sheketoff, he "adequately prepared for sentencing," including by meeting with a sentencing expert selected by Lindley, consulting with Lindley about errors in the draft presentence report, and making appropriate objections to the report.  Doc. No. 1108-1 ¶ 24.

Lindley's first three grievances cannot support a claim of constitutional ineffectiveness. Sheketoff violated no general legal rule or professional norm by leaving Lindley alone for part of his presentencing interview, speaking with a sentencing expert before Lindley arrived to the meeting, or using "technical language" when discussing complex sentencing issues with that expert.  Lindley has altogether failed to show that these circumstances, in this case, somehow rose to the level of a constitutional violation.

As to his remaining complaints, Lindley's characterizations are belied by the record. Sheketoff filed a sentencing memorandum summarizing information provided in dozens of letters written on Lindley's behalf by family, friends, colleagues, and former clients, and attaching copies of the letters.[25]  Doc. No. 625.  The memorandum confirms that Sheketoff filed objections to the presentence report.  Id. at 12.  The transcript of Lindley's sentencing hearing reflects that Sheketoff addressed the applicable sentencing guidelines, reiterated objections to the presentence report, responded to points made by the government in its sentencing presentation, and identified reasons to impose a sentence below the relevant guideline range.  Doc. No. 675 at 5-7, 15-18, 21, 35-39.  In all, the transcript flatly contradicts Lindley's claim that Sheketoff "spoke practically nothing."  Doc. No. 1024 at 10; Doc. No. 1163 ¶ 52.[26]

---

[25] Sheketoff also moved to set aside the verdict, Doc. No. 511, supporting the motion with a memorandum of law challenging the sufficiency of evidence of Lindley's guilt, Doc. No. 514.
[26] The transcript also reflects that Lindley's complaint about Sheketoff's tardiness was exaggerated.  Doc. No. 675 at 3 (reflecting hearing began at 3:34 p.m. with Sheketoff thanking the Court "for waiting for [him]"); see E-order dated Oct. 26, 2010 (continuing sentencing hearing and setting time for 2:30 p.m.).  Lindley has not even hinted at how the one-hour delay was objectively unreasonable or detrimental to him.

Lindley has not established deficient performance by Sheketoff in connection with his sentencing, let alone that Sheketoff's conduct adversely impacted Lindley's sentence.[27]

C. Cumulative Ineffectiveness

To the extent Lindley meant to include a claim that the cumulative effect of the alleged errors he identifies would support a finding of ineffectiveness, such a claim would fare no better than Lindley's discrete challenges to Sheketoff's performance.  Having carefully considered Lindley's motion and all supporting materials, the Court concludes Lindley has not satisfied Strickland, whether his laundry list of complaints are considered individually or in the aggregate. That is, none of Sheketoff's challenged decisions or alleged failures—measured alone or together—amounted to deficient performance, nor is there a basis for concluding any or all of the challenged conduct deprived Lindley of a trial whose result was reliable.

IV. CONCLUSION

This Memorandum and Order exceeds forty pages, not because Lindley has raised novel, difficult, or close claims—he has not.  His testimony about facts central to his claims was patently incredible.  His challenges, though numerous, are unfounded; they are contradicted by the trial record and by Sheketoff's credible testimony.  The length of the decision reflects the Court's effort to carefully, completely, and conclusively resolve Lindley's claims, which arise out of a lengthy, hard-fought trial over which the undersigned did not preside.

---

[27] In fact, the record suggests Sheketoff's advocacy was effective, as Lindley's sentence was eighteen months less than the one the government requested and six months less than the bottom end of the applicable guidelines range.  Doc. No. 675 at 23, 35, 42-43.

In light of the foregoing discussion, Lindley's motion for relief pursuant to § 2255 (Doc. No. 1024) is DENIED.[28]  His request for findings and rulings (Doc. No. 1163), which Court has construed as a reply brief, is TERMINATED.

SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[28] As "reasonable jurists" could not "debate whether . . . the petition should have been resolved in a different manner," <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000), no certificate of appealability shall issue, 28 U.S.C. § 2253(c).  In light of the trial record and the credible testimony offered during the evidentiary hearing, there is no basis for finding that trial counsel was deficient, let alone constitutionally ineffective, in his representation of Lindley.